THE FIRST NATIONAL BANK OF CHICAGO, as Trustee, Plaintiff-Appellee, v. NARCISSA SWIFT KING *et al.*, Defendants (Nathan B. Swift, Jr., *et al.*, Defendants-Appellees; Martha Herriott Swift *et al.*, Defendants-Appellants).

First District (6th Division) No. 1—93—0060

Opinion filed May 13, 1994.

William G. Myers and Alan S. Madans, both of Rothschild, Barry & Myers, of Chicago, for appellants.

Russell M. Pelton and Lois K. Winston, both of Oppenheimer, Wolff & Donnelly, of Chicago, for appellees Nathan B. Swift, Jr., Nathan B. Swift IV, and Alden Swift O'Brien.

JUSTICE McNAMARA delivered the opinion of the court:

This appeal is from an order of the circuit court of Cook County in an action for the construction of a will, executed in 1936, limiting gifts over to the "lawful descendants" of the testator's deceased son and his surviving wife. Plaintiff, First National Bank of Chicago, as trustee, filed a complaint for instructions seeking resolution of the conflicting claims asserted by defendants. The trial court held that a daughter adopted by a child of the deceased son and surviving wife was not entitled to share, as a "lawful descendant," in the proceeds of the surviving wife's trust share. On appeal, the adopted daughter argues that a 1989 statute enlarging a presumption that adopteds take as natural-born children, unless the terms of the instrument manifest an opposite intent by clear and convincing evidence, applies.

The testator, Louis F. Swift, Sr., died in 1937. He left a will dated December 11, 1936. The testator was survived by two children, Louis F. Swift, Jr. (Louis, Jr.), who died in 1955, and Idamay Swift Minotto (Idamay), who died in 1943. A third child, Alden B. Swift (Alden), died shortly before the testator in 1936, leaving his wife, Lydia Niblack Swift (Lydia). Lydia died in 1968. Alden and Lydia had three children: Lydia Swift Rowan, who died in 1973, Nathan Butler Swift, Sr. (Nathan, Sr.), who died in 1953, and defendant Narcissa Swift King (Narcissa). At her death in 1973, Lydia Swift Rowan was survived by a daughter, defendant Robin Swift Rowan Clark (Robin), and three grandchildren, defendants Paul Tullis, Tracy Tullis and Alden Swift O'Brien. At his death in 1953, Nathan, Sr., was survived by a wife, Janet Herriott White Swift (Janet), a son, defendant Nathan Butler Swift, Jr. (Nathan), and an adopted daughter, defendant Martha Herriott Swift (Martha), around whom this appeal centers. Martha is the natural daughter of Janet. The remaining

defendants are Nathan Butler Swift IV (Nathan IV), the son of Nathan, and John Harold Swift, the son of Martha.

The will left the substantial bulk of the testator's estate in trust, to be divided into three equal funds. The first fund was named after and established for the benefit of the testator's daughter-in-law Lydia (hereafter the LNS fund). Lydia was to receive all income from this fund for her lifetime. If the trust were to terminate during her lifetime, she was to receive all of the principal of this fund; otherwise, the principal would be distributed upon termination among the "lawful descendants" of Lydia and Alden.

The pertinent language of the will sought to be construed is as follows:

"After the creation of the 'Lydia Niblack Swift Fund', I direct that my trustees shall pay in quarter-yearly installments the net income from said Fund to my said daughter-in-law, Lydia Niblack Swift, during her natural life, if she shall be then surviving; provided, however, that if my said daughter-in-law, Lydia Niblack Swift, shall die after the creation, but before the termination of said 'Lydia Niblack Swift Fund', or if my said daughter-in-law, Lydia Niblack Swift, shall not survive me, the net income from the 'Lydia Niblack Swift Fund', until the termination of said 'Lydia Niblack Swift Fund' shall be paid in quarter-yearly installments to the *lawful descendants*, then surviving, in equal shares *per stirpes*, of my deceased son, Alden B. Swift, and said Lydia Niblack Swift." (Emphasis added.)

Similar trusts were established in the names of the testator's daughter and son, Idamay and Louis, Jr., respectively. At the termination of the LNS fund, the will directs that the corpus of that fund shall be distributed as follows:

"The 'Lydia Niblack Swift Fund', if then in existence, shall be distributed, paid over and delivered to said Lydia Niblack Swift, if she shall be then surviving, or, if she shall be then deceased, in equal shares *per stirpes*, to the *lawful descendants* then surviving of my deceased son, Alden B. Swift, and said Lydia Niblack Swift, but if there shall be no lawful descendant then surviving of my deceased son, Alden B. Swift, and said Lydia Niblack Swift, said 'Lydia Niblack Swift Fund' shall be distributed, paid over and delivered, in equal shares *per stirpes*, to the lawful descendants then surviving of my said daughter, Idamay Swift Minotto, and of my said son, Louis F. Swift, Jr." (Emphasis added.)

The will further provides that if no descendants of Alden and Lydia, Idamay, or Louis, Jr., are living at the termination of any of the funds or at the termination of the last of the funds, the trustee shall distribute the applicable trust estate in varying percentages to the heirs and descendants of the testator's siblings.

Under the will, termination of all three funds is to occur upon the death of the last survivor of the testator's "lawful descendants" who were living at the time of his death. At the time of this appeal, several survivors are still living, and each of the three funds remains as a separate and distinct fund, with numerous possible beneficiaries of each fund still living.

This appeal involves disputed claims solely to Lydia's trust share. Martha claims a portion of Lydia's share on the ground that, as Nathan, Sr.'s adopted child, she is his "lawful descendant." Nathan claims the entire share of Lydia's trust as the only natural-born child of Nathan, Sr.

Lydia received all of the income from her fund during the 31 years from 1937 until her death in 1968. By virtue of the foregoing language of the LFS will, the income from that fund then became distributable to the lawful descendants of Lydia and Alden, to be paid in equal shares *per stirpes*. Lydia's surviving children, Lydia Swift Rowan and Narcissa, each became entitled to one-third of the income from that fund. At present, Narcissa continues to receive her one-third share, and, since the time of her death in 1973, Lydia Swift Rowan's one-third share has been paid to her only child, Robin.

The one-third share of income from the LNS fund which otherwise would have been distributed to Nathan, Sr., had he not predeceased Lydia, became distributable to his "lawful descendants." Beginning in 1968 until 1990, the trustee paid what would have been Nathan, Sr.'s portion of the income of the LNS fund to Nathan as the only natural-born child of Nathan, Sr. No portion of the income from the LNS fund was ever paid to Martha, who had been adopted at the age of 14 by Nathan, Sr., and his wife, Janet. (Janet was Martha's natural mother. However, Martha had previously been adopted and raised by her maternal grandparents, the Herriotts.)

In 1990, Martha made her first claim to the LNS fund. She based her claim on an amendment to the law pertaining to the rights of adopted children in Illinois to receive gifts under testamentary instruments. Specifically, in 1989, the State legislature approved Public Act 86—842, which amended section 1 of the Instruments Regarding Adopted Children Act (Ill. Rev. Stat. 1991, ch. 40, par. 1652) and section 2—4 of the Probate Act of 1975 (Ill. Rev. Stat. 1991, ch. 110$^1$/2, par. 2—4) to create a presumption in favor of adopteds receiving under testamentary instruments executed before September 1, 1955. The relevant portion of the 1989 amendment states:

"For the purpose of determining the property rights of any person under any instrument executed on or after September 1, 1955, an adopted child is deemed a child born to the adopting par-

ent unless the contrary intent is demonstrated by the terms of the instrument by clear and convincing evidence.

*** *After September 30, 1989, a child adopted at any time before or after that date is deemed a child born to the adopting parent for the purpose of determining the property rights of any person under any instrument executed before September 1, 1955, unless* one or more of the following conditions applies:

(1) *The intent to exclude such child is demonstrated by the terms of the instrument by clear and convincing evidence.*" (Emphasis added.) Ill. Rev. Stat. 1991, ch. 40, par. 1652.

See also Ill. Rev. Stat. 1991, ch. 110¹/₂, par. 2—4(f).

Martha contends that the trial court erred in holding that the testator's use of the term "lawful descendants" in defining the class of takers under the LNS fund constituted clear and convincing evidence of his intent to exclude adopteds, such that the presumption favoring adopteds, as set forth in the amendment, was successfully rebutted. The trial court found that, at the time the testator executed his will, the term "lawful descendants" was clearly defined to include only persons in the testator's bloodline, which by definition excluded adopteds.

The issue presented in this case is purely one of law, and as such is subject to *de novo* review. (*South Suburban Safeway Lines, Inc. v. Regional Transportation Authority* (1988), 166 Ill. App. 3d 361, 519 N.E.2d 1005.) Accordingly, we shall construe the 1989 amendment and its application in the present case independently of the trial court's judgment. *Village of Spring Grove v. Doss* (1990), 202 Ill. App. 3d 858, 563 N.E.2d 793.

The amendment did not abrogate the well-settled rule that, in construing a will, a court's primary objective is to ascertain and give effect to the testator's intent. (*Harris Trust & Savings Bank v. Mac-Lean* (1989), 186 Ill. App. 3d 882, 542 N.E.2d 943.) Prior to the enactment of the amendment, adopted children were presumed not to be natural children for purposes of determining property rights under testamentary instruments drafted before 1955. In *Smith v. Thomas* (1925), 317 Ill. 150, 147 N.E. 788 (superseded by the 1989 statute), our supreme court first articulated what has come to be known in Illinois as the "stranger-to-the-adoption rule." The rule established a rebuttable presumption that any gift to the children of another party should be deemed to exclude adopted children:

"When provision is made in a will for the child of some person other than the testator, an adopted child is not included unless there is language in the will or circumstances surrounding the testator at the time he made the will which make it clear that the

adopted child was intended to be included." (*Smith v. Thomas*, 317 Ill. at 158, 147 N.E. at 790.)

The court reaffirmed the validity of the rule 20 years later in *Belfield v. Findlay* (1945), 389 Ill. 526, 60 N.E.2d 403.

In 1955, the rule was statutorily modified when the General Assembly passed a law which stated:

"For the purpose of determining the property rights of any person under any written instrument executed on or after September 1, 1955, an adopted child is deemed a natural child unless the contrary intent plainly appears by the terms thereof." (Ill. Rev. Stat. 1955, ch. 3, par. 165.)

(See also Ill. Rev. Stat. 1955, ch. 4, par. 11—2.) The 1955 legislation reversed the presumption against adopteds expressed in the stranger-to-the-adoption rule to one in favor of adopteds. By its own terms, however, the 1955 amendment was strictly prospective; instruments executed before that date were not affected by the change. Consequently, adopteds claiming under pre-1955 instruments continued to be subject to the presumption of exclusion.

By 1989, the legislature "recognized the confusion and inconsistency created by such differing treatment" (*Schuttler v. Ruark* (1992), 225 Ill. App. 3d 678, 683, 588 N.E.2d 478, 481) with respect to adopteds in instruments executed before September 1, 1955, and those executed after that date. In debates conducted prior to enactment of the 1989 amendment, Senator Berman, the amendment's sponsor, stated:

"[The amendment] deals with several Appellate Court cases regarding the rights of adopted children to take—pursuant to wills and trusts executed prior to September 1, 1955. The law in Illinois, as everyone previously understood it before these court cases, was that adopted children would not inherit under such instruments unless the contrary attempt [*sic*] appeared on the document itself. Two recent Appellate Court decisions have called this widely accepted presumption into question. [The amendment] eliminates the resulting confusion by allowing adopted children to inherit under such documents in certain circumstances." 86th Ill. Gen. Assem., Senate Proceedings, June 26, 1989, at 112.

■ The amendment altered the presumption to one that now consistently applies to all instruments, regardless of the date such instruments were drafted. The amendment had the effect of abolishing entirely the stranger-to-the-adoption rule. However, as the 1989 statute expressly states, the current presumption that an adopted child is a natural child remains subject to rebuttal upon a showing of contrary intent by clear and convincing evidence. Ill. Rev. Stat. 1991, ch. 40, par. 1652; ch. 110¹/₂, par. 2—4(f).

Clear and convincing evidence has been defined as evidence which

leaves the mind well satisfied of the truth of a proposition (*Hotze v. Schlanser* (1951), 410 Ill. 265, 102 N.E.2d 131); strikes all minds alike as being unquestionable (*Lines v. Willey* (1912), 253 Ill. 440, 97 N.E. 843); or leads to but one conclusion (*Johnson v. Johnson* (1953), 1 Ill. 2d 319, 115 N.E.2d 617). The term has been most often defined, however, as that "quantum of proof which leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." (*In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 14, 398 N.E.2d 198, 203.) Although stated in terms of reasonable doubt, clear and convincing evidence is considered to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense. *Estate of Ragen*, 79 Ill. App. 3d at 14, 398 N.E.2d at 203.

Nathan, as the only natural-born child of the testator's grandson, argues that the testator's use of the term "lawful descendants" constitutes clear and convincing proof that the testator intended to exclude adopteds, because in 1936 the definite and unambiguous meaning of that term excluded adopteds.

Only a few appellate decisions have emerged thus far which have construed and applied the 1989 amendment. One such decision—*Continental Bank, N.A. v. Herguth* (1993), 248 Ill. App. 3d 292, 617 N.E.2d 852—involves facts which are analogous to those in the present case. In *Herguth*, the second district addressed the question of whether the use of the term "lawful descendants" in a 1926 trust instrument constituted clear and convincing evidence of an actual intent on the part of the settlor to exclude adopteds from taking under the trust. In a 2 to 1 decision, the *Herguth* court held that it did. In reaching this result, the majority stated that "the settlor is presumed to have known the then-existing law concerning the disposition of his property when he executed the trust." (*Herguth*, 248 Ill. App. 3d at 295, 617 N.E.2d at 855.) The majority concluded that since the legal and ordinary meaning of "descendant" at the time the trust was created in 1926 did not include adopted children, and since the settlor was presumed to know that, the settlor "unmistakably evidenced his intent to limit the class of beneficiaries to his natural born progeny" by the use of that term. (*Herguth*, 248 Ill. App. 3d at 296, 617 N.E.2d at 857.) This conclusion was further supported, in the court's view, by the settlor's use of the term "*per stirpes*" in describing the method of distribution under the trust. *Herguth*, 248 Ill. App. 3d at 298-99, 617 N.E.2d at 856.

■ Justice Inglis dissented, arguing that the 1989 statute "changed the prism" through which the trust language was to be examined. (*Herguth*, 248 Ill. App. 3d at 300, 617 N.E.2d at 858 (Inglis, J., dissenting).) Justice Inglis stated:

"I agree that the term 'descendants' *ordinarily* meant only blood kin in 1926, when the trust was executed. If we were construing the trust under normal circumstances, with words to be given their 'plain and ordinary' meaning [citation], adopteds would not take ***. However, the 1989 statute changed the prism through which we must examine the trust's language.

The trust's use of the terms 'descendants' and '*per stirpes*' does not convince me that the settlor *even considered the question of adopted heirs, much less convince me that he intended to exclude them.* The majority does not give the 1989 statute its intended effect and, in fact, renders it a nullity by making the 'clear and convincing evidence' test and the 'plain and ordinary language' test indistinguishable." (Emphasis added.) (*Herguth*, 248 Ill. App. 3d at 300-01, 617 N.E.2d at 857 (Inglis, J., dissenting).)

We agree with Justice Inglis' analysis and application of the 1989 amendment and accordingly decline to adopt the holding of the *Herguth* majority in the present case. For the reasons which follow, we hold that Nathan has failed to meet his burden of proving, by clear and convincing evidence as demonstrated by the terms of·the instrument, that the testator actually intended to exclude adopteds from taking under his will. We agree with Justice Inglis that the testator's use of the terms "lawful descendants" and "*per stirpes*" does not amount to clear and convincing evidence of such intent so as to rebut the new presumption that an adopted child is deemed a child born to the adopting parent.

Indeed, we do not believe that the legislature would permit its new presumption—that an adopted is a natural child (and thus also a "descendant")—to be rebutted merely by reference to an old judicial presumption that an adopted is *not* a "descendant," particularly since the legislative action was intended to reverse and supplant the judicial one. The problem at the heart of this case almost always arises, not because the testator clearly references adopteds, but because of the use of words such as "descendants" or "issue." Yet, under the *Herguth* majority ruling—which ascribes a hard and fast meaning to the word "descendants"—the statute never could apply to any class defined by that word. We believe that this result flies in the face of the very purpose and language of the amendment.

In *Purifoy v. Mercantile-Safe Deposit & Trust Co.* (D. Md. 1974), 398 F. Supp. 1075, the court addressed the very issue which is raised in the present case, namely, whether the term "descendants" (as well as the words "child" and "children") included an adopted child under various testamentary instruments. The defendants there, like Nathan here, argued that the intention of the testator was clear and unambiguous, since the words "child" or "children" excluded adopted

children under the law prior to 1947, and that the testator was presumed to know the law and to execute his will in accordance with the law at that time. *Purifoy*, 398 F. Supp. at 1079.

In response to this argument, the court stated:

> "This argument, however, fails to properly distinguish between the *actual* intent of the testator in employing the words in question and the meaning that a rule of construction assigns to them. \*\*\* [F]or these words to reflect a clear actual intention, this Court would have to make the unwarranted assumption that the testator *actually considered the contingency of adoption in choosing the words*. The defendants \*\*\* find actual intention in a combination of the terms 'child,' 'children,' etc. and the rule of construction prior to 1947, which excluded adopted children of one other than the testator. In other words, the defendants would have an earlier rule of construction, without anything else, become part of the testator's actual intent so as to defeat the retroactive application of a subsequent and conflicting [statutory] rule of construction. By definition, a rule of construction is not synonymous with or a part of the actual intent of the testator. Its function is to assign a meaning to the words when the testator's actual intention cannot be determined, and only after the failure to find an intention can a rule of construction be considered. \*\*\* *Therefore, since the testators used only the words 'child,' 'children,' and 'descendants' and since the will and surrounding circumstances fail to reveal that the contingency of adoption was ever considered, no actual intention of the testator concerning adopted children is present. The meaning to be ascribed the words in question is to be found in one of the two applicable rules of construction.*" (Emphasis added.) (*Purifoy*, 398 F. Supp. at 1079.)

In *Purifoy*, the competing rules of construction were an earlier versus a later version of a statute. Here, competition is between the old judicial presumption and the new statutory one. Nathan's effort to elevate the judicial presumption, that "lawful descendants" could only mean members of the bloodline since the stranger-to-the-adoption rule in 1936 excluded adopted children of one other than the testator, to "actual intent" calls into play the following additional comments of the *Purifoy* court:

> "Here, however, two conflicting rules can be used, and the defendants are trying to elevate one to the status of an 'actual intention' of the testator so as to overcome any possibility that the opposing rule could be employed. This, they clearly cannot do." *Purifoy*, 398 F. Supp. at 1079 n.3.

We concur in the sound reasoning of the *Purifoy* court. As stated, the statute here changed the prism through which the language of

the will must be examined. Courts which prior to 1989 had ascribed to the term "descendants" the meaning which Nathan espouses (that it includes only those in the bloodline) and which had interpreted pre-1955 instruments using that term as manifesting the testator's intent to thereby exclude adopteds, in reaching that end necessarily resorted to the *presumption* that use of the term—when considered in light of the then prevailing law that adopteds were excluded in the absence of evidence of a contrary intent—must have signified, and indeed was sufficient proof of, the testator's intent to exclude adopteds. Such a presumption does not now suffice, however, to satisfy the new statutory burden of showing, by clear and convincing evidence, the testator's *actual* intent to exclude adopteds. While the *ordinary* definition of "descendants" in 1936 may have meant only persons in the bloodline (see, *e.g.*, *Stewart v. Lafferty* (1957), 12 Ill. 2d 224, 145 N.E.2d 640; *Herguth*, 248 Ill. App. 3d 292, 617 N.E.2d 852), the use of this term, absent evidence that the testator actually considered the contingency of adoption, does not represent the quantum of proof necessary that the testator actually intended to exclude adopteds from taking.

Confining ourselves, as the statute dictates, to the terms of the instrument in ascertaining the testator's actual intent with respect to adopteds, we can glean no evidence that the testator even considered the question of whether such persons could take, let alone that he intended to exclude them from taking. To presume that the testator considered the possibility of adoption in choosing the term "lawful descendants" would have the effect of improperly elevating the old judicial presumption to the status of an "actual intention" of the testator so as to avoid the operation of the new statutory presumption, rebuttable by evidence of a contrary intent, that adopteds are natural children (and thus "descendants"). In our view, if the testator had any intention whatsoever with respect to adopteds taking under his will, "it is hardly possible that he would not have expressed his desires in the clearest terms." Kales, *Rights of Adopted Children*, 9 Ill. L. Rev. 149, 160 (1914).

The following comments of our supreme court in *Continental Illinois National Bank v. Clancy* (1959), 18 Ill. 2d 124, 163 N.E.2d 523, further clarify the distinction between actual and presumed intent. In *Clancy*, the court was attempting to ascertain the intent of a trust settlor who used the term "lawful issue" to define the class of takers. The court emphasized that it was "without omniscience to know what was in [the settlor's] mind in 1928 when he executed this trust." (*Clancy*, 18 Ill. 2d at 131, 163 N.E.2d at 528.) The court was thus forced to resort to established rules of construction to reach its

conclusion that "lawful issue" did not include adopteds. The significance of *Clancy* lies in our supreme court's own recognition that evidence of the settlor's *actual* intent regarding adopteds was absent, as witnessed by the lack of any reference to adopted children in the trust instrument. Applying the ordinary meaning of "lawful issue" in 1928, against the backdrop of the stranger-to-the-adoption rule which had first been articulated by that court in 1925, the court presumed that the settlor did not intend to include adopteds. The court was well within its bounds to decide the case in this fashion, because the 1989 statute was not in existence at that time.

However, the 1989 amendment "corrected the [former] presumption so that it now conforms to the inference that common sense dictates be drawn from the course of events that culminates in an adoption, *which is that an adopted child was intended to be treated no different than a natural child.*" (Emphasis added.) (*Schuttler*, 225 Ill. App. 3d at 684, 588 N.E.2d at 481.) We are bound to this new presumption, and we find that Nathan has failed to clearly and convincingly rebut it by the terms of the instrument.

Nathan argues that our approach sends the message that the well-settled meaning of words can be easily disregarded. He contends that the testator, in drafting his will, had a right to rely on the established meaning in 1936 of the term "lawful descendants" as including only persons in his bloodline. In response, we note initially that it remains a question just how "established" such terms as "descendants" and "issue" were, in the context of ascertaining the rights of adopteds, in the early part of this century. In 1936, our supreme court had not yet had occasion to interpret or construe the term "lawful descendants" in any controversy involving the rights of an adopted person.

Moreover, in recent times, this court has called into question the significance of the use of terms such as "issue" and "descendants" in pre-1955 instruments as far as ascertaining the testator's intent to exclude adopteds is concerned. In *Chicago Title & Trust Co. v. Vance* (1988), 175 Ill. App. 3d 600, 529 N.E.2d 1134, for instance, the issue was whether adopted children of the testator's daughter were entitled to share in the proceeds of the daughter's trust share where a 1924 codicil stated that, upon the daughter's death, her share "shall pass to the *lawful issue* then surviving." (*Vance*, 175 Ill. App. 3d at 602, 529 N.E.2d at 1135.) This court held that the adopted children were in fact "lawful issue" under the law in force when the will was republished by codicil in 1924. In reaching this result, the court relied in part on our supreme court's 1919 decision in *Munie v. Gruenewald* (1919) 289 Ill. 468, 124 N.E. 605. In *Munie*, the court, in determining

whether an adopted child fell within the class of his children's "children," stated:

> "If it had been the intention of the testator to exclude this [adopted] child [of his daughter] from participating in the distribution of his estate, he could easily have limited the property to *the heirs of his body,* or to *children of the blood of his children,* or to *children born to his children.* No such limitation was made in the testator's will and there is nothing in the will to indicate that such was his intention." (Emphasis added.) (*Munie,* 289 Ill. at 472, 124 N.E. at 607.)

The *Vance* court characterized *Munie* as "a road map to anyone desiring to exclude adopted children from his will." (*Vance,* 175 Ill. App. 3d at 605, 529 N.E.2d at 1137.) The court held that since the testator did not use the "exclusionary terms" established in the *Munie* court—"heirs of *his body*" or "children of the *blood* of his children" or "children *born* to his children"—and since there was nothing in the will or codicil evidencing an intention on the part of the testator to confine his property to members of his bloodline, the adopted children should take as the "lawful issue" of the testator's daughter. *Vance,* 175 Ill. App. 3d at 605, 529 N.E.2d at 1137.

In *MacLean* (186 Ill. App. 3d 882, 542 N.E.2d 943), which, though a 1989 case, was decided before the amendment became effective, the court addressed the question of whether certain adopted children could properly take under a clause which stated that, upon the termination of the trust the principal "shall go to and be divided between my lawful issue then surviving, *per stirpes.*" (186 Ill. App. 3d at 885.) An additional question concerned whether adopted children could become trustees of the testator's estate under language which provided that "descendants" of the testator were, under certain circumstances, eligible to become a trustee.

This court rejected the trustees' argument that the testator's persistent use of the words "lawful issue" and "descendants" necessarily evidenced an intent to exclude adopteds. This court held that "[t]he plain and ordinary meaning [in 1914] of th[ese] technical term[s] *** d[id] not indicate that the effect of th[ese] term[s] in testamentary instruments would be to exclude adopteds." (*MacLean,* 186 Ill. App. 3d at 887, 542 N.E.2d at 946.) The court further held that the very fact that the parties offered several differing constructions of the provisions at issue demonstrated their inherent ambiguity. The court thus concluded that in the absence of extrinsic evidence, the testator's actual intent could not be ascertained. (*MacLean,* 186 Ill. App. 3d at 888, 542 N.E.2d at 947.) The court remanded the case for a determination of the testator's intent utilizing applicable rules of construction.

On remand, the trial court, applying the then newly enacted 1989 amendment, held that the terms used in the instrument did not provide clear and convincing evidence of an intent to exclude adopteds. Accordingly, under the statute, the adopteds took as the settlor's "lawful issue." Harris Trust & Savings Bank v. Morse (Cir. Ct. Cook Cty. July 13, 1990), No. 86 CH 10570, slip op. at 5.

Further evidence of the seeming uncertainty of the term "descendant" is evidenced by the fact that it no longer suffices to express an intent to exclude adopteds under any instrument executed after 1955. Acknowledging the difference between the presumption in favor of adopteds under post-1955 instruments (as to which the presumption was prospective and known in advance) as opposed to pre-1955 instruments (as to which the presumption was applied retrospectively), we fail to see how this distinction explains how a term that does not suffice to exclude adopteds under post-1955 instruments could be so definite and unambiguous as to constitute clear and convincing evidence of an intent to exclude all adopteds in pre-1955 instruments.

In response, Nathan argues that a change in the meaning of "lawful descendants" occurred upon the enactment of the 1955 legislation. We do not agree. The legislation was silent as to the meaning of the word "descendants"; there is simply no evidence that the legislature sought to revise any prior understanding of that term. In our view, the fact that in post-1955 instruments the word is inadequate to demonstrate an intent to exclude adopteds evidences that the term did not as clearly and unambiguously signify an intent to exclude adopteds in 1936 as Nathan contends. Moreover, considering the language of the will before us in its entirety, we conclude that, far from evidencing an actual intent to exclude persons not in the bloodline, including adopteds, the language of the will suggests that the testator was not nearly so concerned with keeping the objects of his bounty in his bloodline as Nathan maintains.

The will, for instance, established the very fund at issue—the LNS fund—for the exclusive benefit of the testator's daughter-in-law Lydia, a stranger to his blood. In fact, there was a distinct possibility, under the terms of the will, that Lydia could have received the entire principal from her fund—in preference to and to the complete exclusion of any *blood* relative of the testator—and disposed of it in any way she chose, including a gift to Martha, whom she knew as her granddaughter. As it happened, for 31 years Lydia exclusively enjoyed the income from the LNS fund, with blood relatives taking nothing until after her death.

Moreover, other portions of the LFS will demonstrate that com-

parable benefits as to income and principal were conferred upon Libby Swift, another daughter-in-law—and nonblood relation—of the testator. Furthermore, in still other portions of the LFS will, the testator provided that shares designated for certain of his relatives would, upon the prior demise of such relatives, be distributable to their "heirs"—a class which is not necessarily limited to the bloodline.

As the foregoing makes clear, not only did the testator not confine the objects of his bounty to his bloodline, but his will made substantial provision for persons not of his blood. In our view, this constitutes persuasive evidence that the testator would be just as willing to allow his grandson's adopted child to share in his bounty. Since the testator embraced descendants' choice of spouses, there is every reason to believe he would accept a descendant's choice of an adopted child.

Nathan argues, however, that the testator's use of the term "*per stirpes*" supports his contention that the testator intended to exclude adopteds. Nathan reasons that since (1) "*per stirpes*" means "by right of representation," (2) the Adoption Act of 1874 prohibited adopteds from "taking property *** from the lineal or collateral kindred of such [adoptive] parents by right of representation" (Ill. Rev. Stat. 1931, ch. 4, par. 5), and (3) the testator is presumed to have known that this was the law, his use of the term necessarily demonstrates an intent to exclude adopted persons from taking under his will. However, this provision of the Adoption Act only prohibits an adopted from inheriting an *intestate* share from anyone other than the adoptive parents; the exception has no application in the situation where an adopted child seeks to take pursuant to the terms of a written instrument. (See *In re Estate of Dawson* (1988), 168 Ill. App. 3d 391, 522 N.E.2d 770.) Since Martha is not claiming an intestate share, Nathan's argument must fail. Moreover, as Martha accurately states, construing the Adoption Act in any other way would lead to the absurd conclusion that the *per stirpes* language in the will would exclude Martha even if the will had expressly provided that adopteds were to be included within the definition of "lawful descendants."

As a final contention, Nathan asserts that the 1989 amendment, as interpreted by Martha, violates the separation of powers clause of the Illinois constitution as well as his right to due process.

As to the first of these two contentions, Nathan argues that the legislation as interpreted by Martha usurps the judiciary's exclusive power to construe testamentary instruments and to ascertain the testator's intent by establishing a presumption that cannot be overcome. He maintains that if Martha is correct in her assertion

that the statute overrules all prior rules of judicial construction, including presumptions as to the significance of the use of such words as "descendants" or *"per stirpes"* in a testamentary instrument, then it is impossible to disprove Martha's assertion that the testator did not show an actual intent to exclude adopteds. In Nathan's view, Martha's approach would thus convert a rebuttable presumption into an irrebuttable one.

It is well settled that every statute is presumed to be constitutional, and the party challenging it has the burden of proving its invalidity. (*Sanelli v. Glenview State Bank* (1985), 108 Ill. 2d 1, 483 N.E.2d 226.) Moreover, an interpretation that renders a statute valid is always presumed to have been intended by the legislature. *Schuttler*, 225 Ill. App. 3d at 683, 588 N.E.2d at 480.

The constitutional validity of a legislative presumption hinges on a finding that there is "some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate." (*Mobile, Jackson & Kansas City R.R. Co. v. Turnipseed* (1910), 219 U.S. 35, 42-43, 55 L. Ed. 78, 80, 31 S. Ct. 136, 137-38.) Under the statute, the ultimate fact presumed is that the testator intended to include adopted children within the terms of the instrument, and the fact established is Nathan's failure to clearly and convincingly demonstrate the testator's actual intent to exclude adopted children. We cannot conclude that a rational connection is lacking between the two. The presumption of inclusion "comports with wide human experience and has been adopted in other jurisdictions." *Purifoy v. Mercantile-Safe Deposit & Trust Co.* (D. Md. 1975), 398 F. Supp. 1082, 1085, *aff'd* (4th Cir. 1977), 567 F.2d 268.

Nathan argues, however, that the predicate of the statutory presumption (absence of clear and convincing evidence demonstrating an intent to exclude adopteds by the terms of the instrument) is absent in light of the testator's use of the words "lawful descendants" and *"per stirpes."* As our foregoing discussion indicates, however, we have determined that the use of such terms is insufficient to demonstrate an *actual* intent on the part of the testator to exclude adopteds. This argument is therefore without merit.

■ Furthermore, contrary to Nathan's contention, the statutory presumption favoring adopteds is not irrebuttable in the face of our determination that the use of the terms "lawful descendants" and *"per stirpes"* is insufficient to prove actual intent. As Martha points out, "even the most simple and crude sentence or phrase to the effect that a testator did not wish to include adopted children would be honored." Our supreme court in *Munie*, for instance, cited several

terms—"heirs of *his body*," "the children of the *blood* of his children," and "children *born to his children*"—which would suffice to indicate an intent to exclude adopteds. The testator used none of these. The will was indeed silent on the matter of adopteds. We find Nathan's separation of powers claim to be without merit.

We similarly reject Nathan's claim that the retrospective application of the statute violates his right to due process. Nathan argues that Martha's construction of the statute would defeat his good-faith expectation of receiving his existing beneficial interest as well as his father's share of the principal. Nathan's argument, however, rests on the assumption that it is the statute which operates substantively to destroy his property interests, and not the language of the will itself. As we have determined, it is precisely Nathan's inability to demonstrate by the terms of the instrument the testator's intent to exclude adopteds which makes the statute applicable.

The amendment is nothing more than a rule of evidence; it is not a rule of substantive law. (*Schuttler*, 225 Ill. App. 3d at 684-85, 588 N.E.2d at 481.) The statute does no more than create a rebuttable presumption that an adopted child is deemed a child born to the adopting parent. By the terms of the statute, any person may rebut the presumption by introducing clear and convincing evidence of a contrary intent plainly appearing from the terms of the instrument. Thus, the effect of the statute is merely to establish a *prima facie* case in favor of the adopted child and to place upon those opposing inclusion of the adopted child the burden of producing evidence of a contrary testamentary intent. By allocating the burden of proof, the statute operates as a rule of evidence, and no constitutional deprivation of due process can result from operation of an evidentiary presumption created by the legislature. (See *Schuttler*, 225 Ill. App. 3d 678, 588 N.E.2d 478.) There is "no constitutional prohibition against the legislature changing" a rebuttable presumption retroactively if it leaves a party a "fair opportunity to make his defense." (*Illinois Public Aid Comm'n v. Brauer* (1957), 11 Ill. 2d 416, 419, 142 N.E.2d 789, 791.) There is no question but that the statute has allowed Nathan this opportunity. Accordingly, we find this final claim to be without merit.

In summary, we hold that Nathan has failed to rebut, by clear and convincing evidence of a contrary intent on the part of the testator as demonstrated by the terms of the will, the statutory presumption that Martha is a "child born to the adopting parent" and, accordingly, a "lawful descendant" of the testator. In addition, we find the statute to be constitutional.

For the foregoing reasons, the judgment of the circuit court of

Cook County is reversed, and the cause is remanded for further proceedings consistent with this decision.

Judgment reversed and cause remanded.

EGAN, P.J., and RAKOWSKI, J., concur.